NEW ENGLAND TRUST COMPANY, trustee, and others *vs.*
CITY OF BOSTON.

Suffolk.   April 8, 1938. — May 25, 1938.

Present: RUGG, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Municipal Corporations*, Liability for tort.  *Public Officer.  Boston.*
*Building Laws.  Election.*

The institution by the city of Boston of a suit in equity under § 129 of
St. 1907, c. 550, to enforce a demand made by the building commis-
sioner under §§ 4, 5, as amended, did not preclude the commissioner
from taking action under § 5 to enforce a later demand made by him
after a further inspection as to different conditions which arose after
the suit was begun.

The building commissioner of Boston, appointed under St. 1907, c. 550,
is a public officer, and no action of tort could be maintained against
the city for acts ordered by him in good faith in performance of his
duties under §§ 4, 5, as amended.

BILL IN EQUITY, filed in the Superior Court on May 19,
1930.

After a hearing by *Goldberg*, J., a final decree was entered.
The plaintiffs appealed.

*J. L. Sheehan*, (*W. F. Byrne* with him,) for the plaintiffs.

*E. K. Nash*, Assistant Corporation Counsel, for the de-
fendant.

Cox, J.   On May 19, 1930, the plaintiffs filed this bill
in equity in the Superior Court by which they sought to
enjoin the defendant from tearing down what remained of
their building, numbered 17 Beacon Street, in Boston.  No
injunction ever issued.   On May 26, 1930, demolition of
the building began and was continued until the building
was completely removed.   It is agreed that the building
was taken down by the building commissioner of the city
of Boston, acting under St. 1907, c. 550, §§ 4 and 5, as
amended by St. 1923, c. 462, §§ 2 and 3.   The plaintiffs
were allowed to amend their bill on December 16, 1935, by
alleging that the defendant had torn down the building, and

removed and disposed of the building materials "for which these plaintiffs claim damages," and by adding a prayer that the amount of damages be ascertained. To this amendment, the defendant answered that the building was caused to be removed by the building commissioner of the city of Boston acting under St. 1907, c. 550, § 5, as amended, and that the building materials were disposed of in accordance with that statute. The case was tried in April, 1937. The trial judge filed "Findings of Fact, Rulings and Order for Decree," and the plaintiffs appealed from a final decree dismissing the bill.

The evidence, which is reported, relates to the physical condition of the building, its value, the examination of it by building inspectors and the various steps taken by the building commissioner that culminated in its removal. The trial judge found that on May 7, 1929, a building inspector, assigned by the building commissioner, inspected the building and thereafter made several other inspections prior to September 18, 1929. On that day he made a report to the building commissioner which stated, among other things, that the building was "unsafe and dangerous." The following day the commissioner caused notice to be given that the building "being unsafe so as to endanger life and a common nuisance, you are hereby notified forthwith to remove the cause of danger and abate the nuisance." The notice contained specifications as to the alleged dangerous conditions. On January 15, 1930, an inspector reported that he had inspected the premises and that nothing had been done. On January 20, 1930, the city of Boston brought a bill in equity admittedly under St. 1907, c. 550, as amended, against the then trustees who held legal title to the building. Thereafter, as more fully appears hereinafter, the trustees removed the three upper stories of the building. The bill in equity was never heard on the merits and was dismissed on June 8, 1936, under Rule 85 of the Superior Court (1932). In the latter part of April, 1930, a building inspector examined the building and on May 1, 1930, reported to the building commissioner that the building was "dilapidated and a fire menace and

is unsafe and dangerous." On May 5, 1930, the building commissioner caused another notice to be given to the legal owners which was of the same tenor as the notice given on September 19, 1929, except that it contained more details as to the alleged condition of the building and described it as dilapidated and a fire menace, and unsafe and dangerous so as to endanger life. On the same day the building commissioner, in writing, asked the mayor of Boston, in accordance with the provisions of St. 1907, c. 550, §§ 4 and 5 as amended, for his permission to enter the premises and remove the building forthwith. The mayor gave his approval in writing on May 7, 1930. On May 8, 1930, the commissioner notified the owners that the mayor had authorized the removal of the building and that, if they desired the material in it, they must notify the building department at once. Thereafter the building was completely demolished. The building inspectors and building commissioner acted in good faith in making their respective findings, determinations and orders. The trial judge ruled that the building commissioner was a public officer whose powers and duties were prescribed by statute and that the defendant was not liable for his act in causing the building to be demolished. If this ruling is right, it is unnecessary for us to consider the argument of the plaintiffs that the case should have been retained for assessment of damages. No question is raised by the plaintiffs as to the compliance by the building commissioner with St. 1907, c. 550, §§ 4 and 5, as amended by St. 1923, c. 462, §§ 2 and 3.

We think that the ruling was right and that the bill was dismissed properly.

St. 1907, c. 550, § 1, as amended by St. 1923, c. 462, provides that there shall be a building department in the city of Boston which shall be under the charge of the building commissioner, who shall have had at least five years' experience as an architect, a builder, or a civil engineer, and shall be appointed by the mayor for a term of five years. The commissioner's salary is fixed by the city council with the approval of the mayor, and he has the power of appoint-

ment, with the approval of the mayor, of such numbers of inspectors, employees and assistants as the city council shall determine. He names his deputy. He is required to have kept a record of the business of his department and to submit to the mayor a yearly report of such business. He grants all permits for the construction, alteration, removal or tearing down of buildings or structures and for plumbing, gas fitting, and the setting and maintenance of steam boilers and furnaces. He may require that plans and specifications for construction or alteration of structures or buildings be submitted to him. He may revoke permits under certain conditions and, if he finds that work is being done without a permit or that the terms of a permit are being violated, he may, after notice to the owner, order the whole or any part of such work stopped, and such work shall not be resumed until he has issued a permit or given his written approval for its continuance. Chapter 550 consists of one hundred thirty-four sections, most of which relate in careful detail to the requirements for the construction and alteration of buildings. Although the commissioner is invested with some discretion as to the quality of materials which may be used and also as to a few other matters, yet, in the main, the statute defines his duties with certainty, for example, by forbidding him to dispense with any of the provisions of the thirty-three sections that relate to tenement houses. Section 4, as amended, requires the commissioner, or one of his inspectors, to inspect every building or other structure "which he has reason to believe . . . exists in violation of any provision of this act, or is unsafe or dangerous to life, limb, or adjoining buildings." Notice to persons in interest of any such condition, if found, is required. Section 5, as amended, provides, among other things, that the person notified shall ". . . comply with the provision of this act which is being violated, or shall secure or remove said building . . . If the public safety so requires, the commissioner, with the approval of the mayor, may at once enter the building or other structure which he finds unsafe or dangerous, . . . with such assistance as he may require, and secure or remove the same . . . ." Section 6 provides for a

board of appeal to which a person who has been refused a permit or has been ordered by the commissioner "to incur any expense" (§ 7) may appeal within specified times. This board after notice and hearing shall affirm, annul, or modify the refusal or order of the commissioner. Section 129 provides, among other things, that any person, the value of whose property may be affected by any decision of the board of appeal, may have the action of the board reviewed by a court of equity by any appropriate process. This section also provides for application to the court by the city to compel compliance with the provisions of the act, including the removal of a building unlawfully existing, and to authorize the commissioner, with the written approval of the mayor, in default of such removal by the owner, to remove it at the owner's expense.

One contention of the plaintiffs is that when the defendant brought its bill in equity against the owners of the building on January 20, 1930, the defendant, "having once entrusted their cause to a court of equity, could proceed in no other way, without the consent of that Court; that their action in bringing . . . [the equity suit] constituted an irrevocable election." The points are overlooked that, after this bill was brought, conferences were held between the owners and building commissioner and that the owners filed an application for a permit to tear down the four upper stories of the building; that the permit was issued and the owners tore down the three upper stories; that the action of the commissioner that is complained of in the case at bar is based upon an inspection which was made in the latter part of April and a report which was made by the inspector on May 1, 1930, when the condition of the building had been altered materially from what it was prior to the filing of the bill in equity by the defendant. The plaintiffs concede that the statute properly provides "for due process of law in Section 129." It was open to the owners to appeal to the board of appeal within ten days after being notified of the commissioner's order and to have the court review the decision of that board. Furthermore, § 131 provides that, upon the entry of any case brought under the

provisions of the act, the court shall, at the request of either party, advance the case, so that it may be heard and determined with as little delay as possible. There is nothing in the record to show that any appeal was taken by the owners or any parties in interest from the orders of September 19, 1929, or of May 5, 1930, and, in the absence of an appeal, obviously there could be no review by the court under § 129.

"The general principles of law by which claims for liability in tort against cities and towns must be determined are well established. The municipality, in the absence of special statute imposing liability, is not liable for the tortious acts of its officers and servants in connection with the gratuitous performance of strictly public functions, imposed by mandate of the Legislature or undertaken voluntarily by its permission, from which is derived no special corporate advantage, no pecuniary profit, and no enforced contribution from individuals particularly benefited by way of compensation for use or assessment for betterments." *Bolster* v. *Lawrence*, 225 Mass. 387, 388–389. An elaborate collection of cases appears on pages 389 and 390 of that opinion. The court, in that case (page 390), said: "The difficulty lies not in the statement of the governing principles of law, but in their application to particular facts. The underlying test is whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability." In the case of *Wood* v. *Oxford*, 290 Mass. 388, 390, it was said: "The distinction between the liability of a municipality for negligence in the conduct of public business and its liability for negligence in the conduct of affairs undertaken in considerable part for income has been stated in numerous decisions. The principle is well settled. *Hill* v. *Boston*, 122 Mass. 344. *Bolster* v. *Lawrence*, 225 Mass. 387, where many cases are reviewed. It is not necessary to traverse that ground again." See *Johnson* v. *Somerville*, 195 Mass. 370.

In the light of this established principle, we are of the

opinion that the defendant is not liable for the acts of the building commissioner.   The defendant had no option as to accepting St. 1907, c. 550, as amended by St. 1923, c. 462, the predecessor of which was said, in *Attorney General* v. *Williams*, 174 Mass. 476, 484, to have been enacted under the police power of the Legislature for the regulation of the erection of buildings in the city of Boston.   The relevant statutes are legislative mandates and differ in this respect from G. L. (Ter. Ed.) c. 143, which provides mainly for the inspection and regulation of buildings in cities and towns that accept its material provisions, as to most of which the defendant is expressly excepted.   The same can be said of the ninety-eight sections of G. L. (Ter. Ed.) c. 144, which relate to tenement houses in cities, except Boston, that accept the chapter or have accepted corresponding provisions of earlier laws.   The comprehensive provisions of St. 1907, c. 550, as amended, impose many restrictions on the erection, alteration and maintenance of buildings and structures throughout the city of Boston.   These provisions relate directly to the health and safety of its inhabitants not only in their homes but also in places of public assembly and upon the streets.   In general, the building commissioner is charged by the statute with the specific duty of seeing that its provisions are complied with.   Whether we regard his acts which the statute requires generally or confine ourselves to the specific acts complained of in the case at bar, they are for the common good of all.   There was no pecuniary profit to the defendant.   In the instant case, the building was assessed in 1929 for $29,300, but in 1930, after the owners had removed the upper stories and left the building open and exposed to the elements, it was rated by the assessors of Boston as of no value.   Nor did the defendant derive any special corporate advantage from the act of the commissioner.   The fact that the statute provides that the expense incurred in removing the building may be recovered of the owner, in no wise can be regarded as conferring any particular benefit on the defendant so as to make it responsible for the acts of the commissioner.   This

is not a provision for "enforced contribution from individuals particularly benefited by way of compensation for use or assessment for betterments." See *Bolster* v. *Lawrence*, 225 Mass. 387, 389.

The plaintiffs contend that the provision of the statute which requires the approval of the mayor before the commissioner may remove a building, as in the case at bar, places the latter, in this instance, under the direct control of the defendant and that consequently the defendant is liable for his acts. It is not suggested that the act of the mayor in granting his approval is of such a character as to render the defendant liable, but, aside from this, we think that the commissioner, in this instance, is none the less a public officer, *Attorney General* v. *Tillinghast*, 203 Mass. 539, 544, and that for his acts in the case at bar the defendant is not liable. *Galassi Mosaic & Tile Co.* v. *Boston*, 295 Mass. 544. The plaintiffs also contend that the defendant, after service and notice of the bill in equity in the case at bar, "at least contributed to the destruction of this building," and that, upon the theory of the liability of joint tort-feasors, the defendant should answer for whatever damages the plaintiffs have sustained. The reasons already stated dispose of this contention.

St. 1907, c. 550, as amended, makes no express provision for the payment of damages to one whose building has been removed under the direction of the building commissioner. Compare G. L. (Ter. Ed.) c. 48, § 5, under which the owner of a building which is demolished in order to prevent the further spreading of a fire may, under certain circumstances, recover reasonable compensation. *Ruggles* v. *Nantucket*, 11 Cush. 433. Compare also G. L. (Ter. Ed.) c. 139, § 2, and G. L. (Ter. Ed.) c. 143, § 10, under which persons aggrieved by orders of certain officials in cities and towns which have accepted the relevant provisions of the statutes, directing the disposition and removal of buildings as nuisances or as unsafe and dangerous, may appeal to the Superior Court for a jury trial of the question of affirmation, annulment or alteration of the orders, and, in the event of an annulment, of the question of their damages. We do

not think, however, that we are called upon, in the case at bar, to construe St. 1907, c. 550, as amended, beyond the points already discussed.

*Decree affirmed with costs.*