NOTICE:   All slip opinions and orders are subject to formal revision
and are superseded by the advance sheets and bound volumes of the
Official Reports.   If you find a typographical error or other formal
error, please notify the Reporter of Decisions, Supreme Judicial
Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston,
MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11519

EVE PLUMB & others[1] vs.  DEBORA A. CASEY, trustee.[2]


Suffolk.     April 8, 2014. - September 8, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, &
Lenk, JJ.[3]


Art.  Consignment.


Certification of a question of law to the Supreme Judicial Court
by the United States Bankruptcy Court for the District of
Massachusetts.


Andrew Z. Schwartz (Joshua S. Pemstein with him) for the
plaintiffs.
Kathleen R. Cruickshank for the defendant.
Steven B. Levine, Nicolas M. Dunn, William D. Currie, & Jessica
T. Lu, for Arts & Business Council of Greater Boston & another, amici
curiae, submitted a brief.

---

[1] Karen Hollingsworth, John Kuhn, Marjie Kuhn, Cynthia
McCallister, William McCarthy, Elizabeth Mumford, Deborah
Quinn-Munson, Anne Neely, John Schieffer, Kat Scott, Dylan Stark,
Robert W. Stark, Jr., and Susan Sugar.

[2] Of the bankruptcy estates of Kenneth Wynne, III; Allyson
Wynne; and Wynne Fine Art, Inc.

[3] Chief Justice Ireland participated in the deliberation on this
case prior to his retirement.

DUFFLY, J. The consignment of fine art is governed by G. L. c. 104A, which provides that, upon delivery of a work of fine art to a consignee, the consignor shall provide a written statement with specified information about the work.[4] See G. L. c. 104A, § 2 (b). A judge of the United States Bankruptcy Court for the District of Massachusetts has certified the following question pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), concerning the effect of a consignor's failure to deliver a written statement as required by G. L. c. 104A, § 2 (b):

> "Under Mass. Gen. Laws. c. 104A, the Massachusetts fine art consignment statute ('Chapter 104A'), must a consignor transmit a written 'statement of delivery' to a consignee as a necessary prerequisite to the formation of a 'consignment'; or, alternatively, under Chapter 104A does a consignment arise upon the delivery by a consignor, and acceptance by a consignee, of a work of fine art for sale on consignment, regardless of whether a written 'statement of delivery' is sent by the consignor?"

For the reasons we discuss, we answer, "No, a written statement of delivery is not a prerequisite for the formation of a consignment under G. L. c. 104A."

Background. We summarize certain undisputed facts in the order of certification and in the record before us. Kenneth Wynne, III, and Allison Wynne (the Wynnes) owned and operated Wynne Fine Art, Inc. (Wynne Gallery), in Chatham. Wynne Gallery accepted art works

---

[4] We acknowledge the amicus brief of Arts & Business Council of Greater Boston and Volunteer Lawyers for the Arts of Massachusetts filed in support of the creditor artists.

that the creditor artists delivered to the gallery, and agreed to sell the art works and pay fifty per cent of the proceeds to the creditor artists.  In 2013, the Wynnes filed for personal bankruptcy under Chapter 7 of the United States Bankruptcy Code, and the appointed bankruptcy trustee of the bankruptcy estates moved to sell many of these art works.[5]

Seeking to enjoin the sale, the creditor artists commenced an adversary proceeding against the bankruptcy trustee in the United States Bankruptcy Court for the District of Massachusetts.  The creditor artists sought a declaration that the art works are held in trust under the Massachusetts fine art consignment statute, G. L. c. 104A, and therefore are not the property of the bankruptcy estates.  The bankruptcy trustee filed a counterclaim seeking a declaration that G. L. c. 104A is inapplicable to the art works at issue because, when the creditor artists delivered their work to Wynne Gallery, they did not provide a written statement describing the art work as required by G. L. c. 104A, § 2 (b).  The creditor artists argue that the delivery and acceptance of the art work alone sufficed to create a consignment relationship protected under the fine art consignment statute.  Acknowledging that the parties' opposing interpretations of G. L. c. 104A raise a dispositive

---

[5] The bankruptcy trustee moved to sell approximately 130 paintings; the creditor artists claim an interest in approximately eighty-five of these works.

question as to which there is no controlling precedent, the judge certified the above question to this court.

Discussion. General Laws c. 104A, § 2 (b), provides that:

"A consignor who delivers a work of fine art hereunder shall, upon delivery of the work of fine art, furnish to the consignee a separate written statement of delivery of the work of fine art, which shall include at a minimum the following information:  (1) the artist's name and the name of the owner of the work of fine art; (2) the title, if any, of the work of fine art; (3) the medium and dimensions of the work of fine art; (4) the date of completion of the work of fine art; (5) the date of delivery of the work of fine art; and (6) the anticipated fair market value of the work of fine art."

The bankruptcy trustee argues that the word "shall" in G. L. c. 104A, § 2 (b), should be interpreted as a mandatory obligation, see Hashimi v. Kalil, 388 Mass. 607, 609 (1983), and, thus viewed, the delivery of a written statement by the consignor is required to effectuate a consignment under the fine art consignment statute. This argument is unavailing both in considering the language of the statute as a whole and when viewed in light of the legislative purpose underlying the 2006 statutory amendments that inserted this provision.  See St. 2006, c. 353, § 6.

1.  Statutory language.  In interpreting the requirements necessary to effectuate a consignment under the fine art consignment statute, our objective is to discern the intent of the Legislature from the text of the statute.  See Champigny v. Commonwealth, 422 Mass. 249, 251 (1996), quoting Lehan v. North Main St. Garage, 312

Mass. 547, 550 (1942) ("The object of all statutory construction is to ascertain the true intent of the Legislature from the words used"). We consider the text of the statute "in connection with [its] development and history, and with the history of the times and prior legislation," Quincy City Hosp. v. Rate Setting Comm'n, 406 Mass. 431, 443 (1990), and cases cited, in order to construe the statute as "a consistent and harmonious whole." EMC Corp. v. Commissioner of Revenue, 433 Mass. 568, 574 (2001), quoting State Tax Comm'n v. LaTouraine Coffee Co., 361 Mass. 773, 778 (1972).

While G. L. c. 104A, § 1, defines the term "consignment" under the fine art consignment statute,[6] G. L. c. 104A, § 2 (a), sets forth specific requirements regarding the establishment of such a consignment:

> "Notwithstanding any custom, practice or usage of the trade to the contrary, or any other language herein, whenever a consignor delivers . . . a work of fine art to a consignee . . . for the purpose of exhibition or sale, or both, on a commission, fee or other basis of compensation, the delivery to and acceptance of the work of fine art by the consignee shall constitute a consignment, unless the delivery to the consignee is pursuant to an outright sale . . . ."

---

[6] Under G. L. c. 104A, § 1, a "[c]onsignment" is

> "a delivery of a work of fine art under which no title to, estate in, or right to possession of, the work of fine art superior to that of the consignor shall vest in the consignee, notwithstanding the consignee's power or authority to transfer and convey to a third person all of the right, title and interest of the consignor in and to the work of fine art."

Thus, according to the plain statutory language, three elements are necessary to constitute a consignment of fine art[7]:  (i) delivery of a work of art by the consignor, and (ii) acceptance by the consignee, (iii) for the purpose of exhibition or sale on commission.[8]  General Laws c. 104A, § 2 (a), states that, unless there is an outright sale of the art work, the occurrence of these three elements "shall constitute a consignment" "[n]otwithstanding . . . any other language herein."  That the consignor provide a written statement

---

[7] "Fine art" is defined as:

"[A] painting, photograph, sculpture, functional sculpture, hologram, wearable art, drawing, fiber-based work, ceramic-based work, metal work, conceptual-based art, glass-based work, an installation, a work that is created or displayed using computer, digital devices and/or new technology such as, but not limited to, digital prints, digital photographs, CD Roms, DVDs, cyberart, a web/internet-based art work, a performance-based art work and the results of the performance such as, but not limited to, film, video, DVDs, CD Roms, a sound work, an electronic-based work, a work of graphic art, including an etching, lithograph, off set print, silk screen/screen print, or work of graphic art of like nature, a work of calligraphy, an artist's book, or a work in mixed media including collage, assemblage or any combination of the foregoing art media."

G. L. c. 104A, § 1.

[8] "Delivery" is defined in G. L. c. 104A, § 1, as "the process of physically transporting a work of fine art from a consignor to a consignee, whether done by the consignor personally, by a professional transportation service, or by the services of an agent or dealer who acts on behalf of the consignor."  "Acceptance" is not defined in G. L. c. 104A.

of delivery is not among the prerequisites for establishment of a consignment under G. L. c. 104A, § 2 (a).

General Laws c. 104A, § 2 (b), then sets forth the requirement of a writing upon delivery of a work of fine art.  See notes 6 and 7, supra.  The bankruptcy trustee urges an interpretation of this provision that would make the delivery of a written statement an additional element necessary to effectuate a consignment.  This interpretation fails to give effect to the plain language of G. L. c. 104A, § 2 (a), stating that the delivery and acceptance of art work for the purpose of exhibition or sale on commission "shall constitute a consignment" "[n]otwithstanding . . . any other language herein," unless there is an outright sale.  If "shall" were interpreted in its mandatory sense in both G. L. c. 104A, § 2 (a), and G. L. c. 104A, § 2 (b), the provisions would be in conflict: under § 2 (a), a consignment could be effective without a written statement of delivery, and under § 2 (b), a consignment could not be effective without a written statement of delivery.  In light of this conflict, it cannot be the case that "shall" is intended in its mandatory sense in both G. L. c. 104A, § 2 (a), and G. L. c. 104A, § 2 (b).  "Seemingly contradictory provisions of a statute must be harmonized so that the enactment as a whole can effectuate the presumed intent of the Legislature."  See Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 853 (2004).

Resolution of this apparent conflict is found in the phrase, "[n]otwithstanding . . . any other language herein," in the opening sentence of G. L. c. 104A, § 2 (a), which provides a clear indication that the use of "shall" in G. L. c. 104A, § 2 (a), is intended in a mandatory sense, whereas the use of "shall" in G. L. c. 104A, § 2 (b), is intended in a directive sense.[9]  See Attorney Gen. v. Commissioner of Ins., 450 Mass. 311, 319 (2008), quoting Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) ("The use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section").  "A statute should be construed so as to give effect to each word, and no word shall be regarded as surplusage."  Ropes & Gray LLP v. Jalbert, 454 Mass. 407, 412 (2009).  To give meaning to all of the terms of G. L. c. 104A, § 2 (a), and to harmonize those terms with G. L. c. 104A,

_____

[9] Our interpretation of the language in G. L. c. 104A, § 2 (a), and G. L. c. 104A, § 2 (b), is also supported by the principle that we "derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions."  Seideman v. Newton, 452 Mass. 472, 478 (2008), quoting Commonwealth v. Zone Brook, Inc., 372 Mass. 366, 369 (1972).  The definition of "consignment" in the Uniform Commercial Code, G. L. c. 106, and in legal dictionaries when G. L. c. 104A was enacted in 1978, see St. 1978, c. 286, and when it was amended in 2006, see St. 2006, c. 353, are in accord that a consignment is the delivery of goods to another for the purpose of selling the goods; none mentions a written statement of delivery as constituting a component of consignment.  See G. L. c. 106, § 9-102 (20); Black's Law Dictionary 380 (4th ed. 1957); Black's Law Dictionary 327 (8th ed. 2004).

§ 2 (b), we read G. L. c. 104A, § 2 (b), as providing a directive standard of practice, and not as adding an additional mandatory element for effecting a consignment under G. L. c. 104A, § 2 (a). See Wilson v. Commissioner of Transitional Assistance, supra (interpreting "shall" in directive sense where doing so was necessary to harmonize statutory provisions).

2. Legislative context and history. Moreover, we interpret the word "shall" in G. L. c. 104A, § 2 (b), in a directive sense, rather than in a mandatory sense, where doing so is necessary to effectuate the primary purpose of the statute. See Wilson v. Commissioner of Transitional Assistance, supra; Boston v. Quincy Mkt. Cold Storage & Warehouse Co., 312 Mass. 638, 646-647 (1942), quoting Swift v. Registrars of Voters of Quincy, 281 Mass. 271, 276 (1932) (term "shall" "is not of inflexible signification and not infrequently is construed as permissive or directory in order to effectuate a legislative purpose"). As discussed below, one of the legislative purposes for the enactment of G. L. c. 104A was to protect the interests of artists in their consigned works in the event that a consignee files for bankruptcy protection; this purpose supports the conclusion that the word "shall" in G. L. c. 104A, § 2 (b), was intended in its directive rather in its mandatory sense.

The fine art consignment statute was enacted in 1978, see St. 1978, c. 286, and was amended in 2006, see St. 2006, c. 353, at

which time G. L. c. 104A, § 2 (b), was added.  See St. 2006, c. 353, § 3.  In determining the intent of the Legislature in adopting the 2006 amendments, we consider "the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished."  Commonwealth v. Wade, 467 Mass. 496, 501 (2014), quoting Flagg v. AliMed, Inc., 466 Mass. 23, 28 (2013).  We look to the language of preexisting statutes because, "[w]hen amending a statute or enacting a new one, the Legislature is presumed to be aware of prior statutory language."  Ropes & Gray LLP v. Jalbert, supra at 412-413.

The 2006 amendments to G. L. c. 104A were first introduced in January, 2005; the language of the proposed § 2 (a) was identical to that in the 1978 statute, and did not include the phrase "any other language herein" after the term "[n]otwithstanding."  Compare 2005 Senate Doc. No. 1838 with G. L. c. 104A, as inserted by St. 1978, c. 286.  The Legislature did not adopt this version, but instead adopted a revised bill in March, 2006, see 2006 Senate Doc. No. 2461, which added both the provision in § 2 (b) requiring that a consignor furnish a written statement of delivery, and the qualification that § 2 (a) is to apply "[n]otwithstanding . . . any other language herein."[10]  These simultaneous revisions further indicate that the

---

[10] The proposed § 2 (b) stated that a "consignee who accepts a work of fine art hereunder shall . . . furnish to the consignor a

Legislature did not intend a consignment under G. L. c. 104A, § 2 (a), to be conditioned or altered by the provision requiring a written statement of delivery in G. L. c. 104A, § 2 (b). See Campatelli v. Chief Justice of Trial Court, 468 Mass. 455, 468 (2014) (comparing versions of proposed legislation to ascertain legislative intent).

The 2006 amendments to the fine art consignment statute were enacted in the wake of the insolvency of two large art galleries in Boston that generated wide-spread public concern about the difficulties faced by artists seeking to reclaim their art work. See Ulrich & Jamieson, Muddled Waters:  An Addendum on Consignment of Fine Art Law in Massachusetts, 37 J. Arts Mgt., L. & Soc'y 301, 302-304 (2008) (insolvent galleries' failure to keep records of consigned art work severely jeopardized ability of artists to reclaim art work

---

separate written statement of acceptance" (emphasis supplied). 2005 Senate Doc. No. 1838.  The revised version of § 2 (b), which was the version that was adopted, stated that a "consignor who delivers a work of fine art hereunder shall . . . furnish to the consignee a separate written statement of delivery" (emphasis supplied).  2006 Senate Doc. No. 2461.  Placing the requirement to provide a written statement on the consignor rather than the consignee made sense in light of the recording system that the amended statute put in place.  See supra.  By adding the phrase "[n]otwithstanding . . . any other language herein" to § 2 (a) in 2006 Senate Doc. No. 2461, the Legislature evidenced its intent that a consignor's failure to meet this requirement would not remove the consignment from the scope of the protections provided in G. L. c. 104A.

and funds from sales of art work).[11]  Viewed against this backdrop,

and considered in conjunction with the other amendments to G. L.

c. 104A enacted at that time, which also enhanced protections to the

consignor,[12] it is apparent that the directive of G. L. c. 104A,

§ 2 (b), to provide a written statement of delivery was designed as

_____

[11] A newspaper article concerning the passage of the 2006 amendment to G. L. c. 104A, describes the extensive volunteer effort that was needed in 2003, in the aftermath of the bankruptcy of Boston Corporate Art, to enjoin the sale of hundreds of consigned paintings, and to help artists retrieve their works from unorganized stacks of paintings held in a warehouse.  See Artists Hunt for their Works Rescued from Bankruptcy Firm, Boston Herald, Aug. 20, 2003, at 58. Following these events, "a working group convened, including members from Volunteer Lawyers for the Arts of Massachusetts (VLA), the Artists Foundation, and the Boston Art Dealers Association, to revise the statute. . . . [A Senator] took the revisions under advisement, and they were successfully enacted into law in November 2006." Ulrich & Jamison, Muddled Waters:  An Addendum on Consignment of Fine Art Law in Massachusetts, 37 J. Arts Mgt., L. & Soc'y 301, 302 (2008).

Upon passage of the bill by the Senate, and prior to being acted on by the Governor, Jim Grace, the executive director of VLA, who helped draft the amendments to G. L. c. 104A, stated that "[t]he main purpose of this statute is to protect the artists," and that "a lot of artists were harmed" because their work was not returned or they did not receive appropriate payment after the closure of the Boston Corporate Art and Haley & Steele, Inc. galleries.  Tougher Rules on Fine Art Consignment Now up to Governor, State House News Service, Oct. 31, 2006.  See Adams v. Boston, 461 Mass. 602, 612 n.17 (2012) ("We employ contemporaneous news accounts not as a source of legislative intent, but as a source of valuable context as to the public dialogue animating the statute's passage").

[12] These amendments included a broader definition of "fine art"; a definition of "consignor" encompassing art collectors; provisions regulating the manner and timing of payments by consignee to consignor; and added confirmation that a trust relationship exists between a gallery and an artist.  Compare G. L. c. 104A, as inserted by St. 1978, c. 286, with G. L. c. 104A, as amended by St. 2006, c. 353.

part of a recording system for consigned art work, and not as a prerequisite for a consignment.[13]

General Laws c. 104A protects consignors' interests in their art work by providing that consigned works of art are not the property of the consignee, but are rather held in trust for the consignor. See G. L. c. 104A, § 4. Like statutes in a number of other jurisdictions, G. L. c. 104A thereby "provide[s] a safe harbor for the artist against the claims of a dealer's creditors." R. E. Lerner & J. Bresler, Art Law: The Guide for Collectors, Investors, Dealers, and Artists 41 (3d ed. 2005). See Jay, A Picture Imperfect: The Rights of Art Consignor-Collectors When Their Art Dealer Files for Bankruptcy, 58 Duke L.J. 1859, 1875-1876 & n.111 (2009) (collecting statutes). The bankruptcy trustee's interpretation of G. L. c. 104A would deny this safe harbor to consignors who fail to deliver

---

[13] This interpretation is also consistent with the purpose of G. L. c. 104A, as initially enacted in 1978. See St. 1978, c. 286. Prior to the enactment of G. L. c. 104A, the Uniform Commercial Code (UCC), G. L. c. 106, applied to the consignment of art work, and afforded minimal protection to consignors of art work in the event that a consignee sought bankruptcy protection. See Ulrich, Muddled Waters: Consignment of Fine Art Law in Massachusetts, 35 J. Arts Mgt., L. & Soc'y 121, 123-124 (2005). Under the UCC, if a UCC financing statement is not filed upon consignment, then a consignor retains only an unsecured interest in the consigned item, see G. L. c. 106, § 9-319. Commentators have noted that many artists do not file UCC financing statements due to the "handshake culture" of the fine art market. See, e.g., Madigan, Orphaned Art Consignors: Confusion in the Courts and the UCC, 29 Cardozo Arts & Ent. L. J. 753, 756-757 (2011); Jay, A Picture Imperfect: The Rights of Art Consignor-Collectors when their Art Dealer Files for Bankruptcy, 58 Duke L.J. 1859, 1862-1863, 1890 (2009).

written statements; such an interpretation is inconsistent with the Legislature's intent to enhance protections for artists' interest in their consigned works in both the original and amended versions of G. L. c. 104A. Compare G. L. c. 104A, as inserted by St. 1978, c. 286, with G. L. c. 104A, as amended by St. 2006, c. 353.

General Laws c. 104A, § 2 (c), requires a consignee to keep a copy of the consignor's written statement of delivery, make a record of sale if the art work is sold, and make records available for review upon request of the consignor. General Laws c. 104A, § 4A (a), requires that a consignee maintain separate accounts for each consignor, and G. L. c. 104A, § 4A (b), requires that payment be made to the consignor within ninety days of the sale of an art work. Failure to make payment within ninety days renders the consignee liable for payment of interest, costs, and attorney's fees, and failure to make payment within 180 days entitles the consignor also to seek treble damages. See G. L. c. 104A, § 4A (b), (c). In the event of a closure of the consignee's business, G. L. c. 104A, § 4A (f), requires a consignee to notify consignors, return works within ninety days, and maintain all records for four years.

The Legislature thus intended the requirement of a written statement of delivery in G. L. c. 104A, § 2 (b), to facilitate a recording system that enhances protections for consignors of art work, and not to create a barrier to such protection. The recording

system and its protections are impeded if a consignor does not provide the consignee with identifying information about the art work, and the name of the artist and the owner of the art work, and as required by G. L. c. 104A, § 2 (b). That the consignor generate the written description of the art work makes sense because the consignor will know the information that is required to be included in the record, such as the work's title, dimensions, medium, and completion date, and the consignor has a significant interest in the record being made. By delivering a written statement that is then kept on record by the consignee, the consignor reduces the risk that art work will be misidentified, become untraceable, or, in the worst case, be forfeited.[14] See G. L. c. 104A, § 4 (c) (consignor forfeits art work if in good faith consignee cannot locate consignor within one year after decision to return unsold work); G. L. c. 104A, § 4A (e) (if in good faith consignee cannot locate consignor, consignee shall not be liable for penalties for failure to make payment, and after four years from date of sale, consignor forfeits payment). A consignor who does not furnish a written statement of delivery thus jeopardizes the consignor's own interest in the art work, but nevertheless effects a valid consignment under G. L. c. 104A, § 2 (a), so long

---

[14] A consignor "is solely responsible for keeping his contact information current with the consignee," including name, mailing address, telephone number, facsimile transmission number, and electronic mail address. G. L. c. 104A, § 4 (c).

as there is delivery of the art work and acceptance for the purpose of exhibition or sale on commission.

Conclusion.  We answer the reported question, "No, a written statement of delivery is not a prerequisite for the formation of a consignment under G. L. c. 104A."

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court.  The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States Bankruptcy Court for the District of Massachusetts, as the answer to the question certified, and will also transmit a copy to each party.